Filed 6/30/14  In re A.H. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.H. et al., Persons Coming Under the Juvenile Court Law | H039967 (Santa Clara County Super. Ct. Nos. JD20223, JD20224 |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> F.S., <br><br> Defendant and Appellant. | |
| In re A.H. et al., Persons Coming Under the Juvenile Court Law. | H040026 (Santa Clara County Super. Ct. Nos. JD20223, JD20224) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> F.S. et. al., <br><br> Defendants and Appellants. | |

A.H. and S.H. ("the children") were each declared a dependent child of the court. (Welf. & Inst. Code, § 300, subds. (a) & (b).)[1]  F.S., the mother of the children, (mother) appeals from the juvenile court's denial of her request for modification of court orders (see § 388) (Case No. H039967) and from the juvenile court's orders following a section 366.26 hearing (Case No. H040026).[2]  S.H.,[3] the father of the children, (father) appeals from the juvenile court's orders following a section 366.26 hearing (Case No. H040026).[4] At the time of section 366.26 hearing on August 14, 2013, A.H. was 13 years of age and S.H. was nine years of age.

We affirm the challenged orders.

*Case No. H039967*

*Appeal from Order Denying Mother's Request for Modification*

A.  *Procedural and Factual Background*

On March 21, 2013, mother filed a written "Request to Change Court Order," in which she asserted that "a number of changes have occurred in [her] life."  In her request, mother indicated that she had completed a 52-week child abusers' treatment program and a 52-week batterers' intervention program.  She stated that she had "taken responsibility for her actions and expresse[d] remorse for how she treated her children before they came

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]     On our own motion, this court ordered Cases Nos. H039967 and H040026 to be considered together for purposes of briefing, oral argument, and disposition.  Also, on our own motion, we deemed a motion to augment the record to be a request for judicial notice and granted the motion to take judicial notice of Case No. H038633.  In addition, on our own motion, we take judicial notice of Case No. H039967 in Case No. H040026 and judicial notice of Case No. H040026 in Case No. H039967.  (See Evid. Code, §§ 452, subd. (d); 459.)

[3]     Father is also known as D.S.H.

[4]     Father filed a notice of appeal purporting to appeal from the court's denial of mother's modification motion.  Father was not aggrieved by the court's decision (see *In re K.C.* (2011) 52 Cal.4th 231, 236) and, in any case, he is not challenging it.

2

into the dependency system." Mother represented that "now that [she had] pleaded to a reduced charge and her criminal matter [was] taken care of, [she] openly accepts 100 percent responsibility for her actions."[5] In addition, mother had "served her sentence for her criminal case," she had been released from custody on March 11, 2013, and she was "no longer at risk of being incarcerated."

Mother specifically requested a new order returning the children to her custody and control under a plan of family maintenance services or, alternatively, new orders providing her with further reunification services and visitation "a minimum of two times a week for two hours for each child." She did not ask the juvenile court to change the children's placement to the home of maternal relatives in Colorado.

Prior to mother's request for modification, the juvenile court had terminated family reunification services for both parents. It had also terminated visitation for both parents, finding that visitation was detrimental to the children's emotional well-being. The court had ordered both dependency cases set for a section 366.26 hearing prior to mother's request.

Mother filed a timely notice of appeal.

B. *Contested Section 388 Hearing*

On June 12, 2013, a contested hearing on mother's request for modification commenced. The juvenile court admitted the section 366.26 report, dated August 8, 2012, and a number of addendum reports.[6] The court also admitted into evidence copies of criminal protective orders against mother (Pen. Code, § 136.2), the juvenile court's November 4, 2010 minute order in the dependency case concerning

---

[5]     An addendum report, dated December 20, 2012, stated that mother was prosecuted for infliction of injury upon a child in violation of Penal Code section 273d. It reported that, on December 14, 2012, mother was sentenced to four years formal probation and ninety days in county jail.

[6]     The original section 366.26 hearing ended in mistrial.

mother's daughter L.M. (Case No. JD20222), and a November 4, 2010 "Custody Order - Juvenile - Final Judgment" in that dependency case.

A criminal protective order filed on August 11, 2010, which expired on August 11, 2011, prohibited mother from having "personal, electronic, telephonic, or written contact" with L.M., A.H., and S.H. It provided an exception to that no-contact provision for "peaceful contact" with the named protected children "only for the safe exchange of children for visitation as stated in a Family, Juvenile, or Probate court order issued after the date [the protective order was] signed . . . ."

On November 4, 2010, the juvenile court dismissed L.M.'s dependency case (Case No. JD20222) and awarded legal and physical custody to L.M.'s father. It gave mother the right to visitation supervised by L.M.'s father. The order permitted visitation "supervised through letters and telephone contact." It also provided that mother "must travel to Arizona for face to face visits." It said nothing about Facebook or other online communications.

A criminal protective order filed August 31, 2011, which expired on August 31, 2012, prohibited mother from having "personal, electronic, telephonic, or written contact" with L.M., A.H., and S.H. It provided an exception to that no-contact provision for "peaceful contact" with the named protected children "only for visitation as stated in a Family, Juvenile, or Probate court order issued after the date [the protective order was] signed . . . ."

A modified criminal protective order, filed September 16, 2011, which expired on August 31, 2012, prohibited mother from having "personal, electronic, telephonic, or written contact" with L.M., A.H., and S.H.[7] It provided an exception to that no-contact

---

[7] Subsequent criminal protective orders under Penal Code section 136.2 have continued the general prohibition against mother contacting L.M., A.H., and S.H., except as specified, through December 14, 2016.

4

provision for "peaceful contact" with the named protected children "only for visitation as stated in a Family, Juvenile, or Probate court order issued after the date [the protective order was] signed . . . ." It additionally provided an exception to the no-contact provision for "peaceful contact" with the named protected children "only for court ordered visitation as stated" in juvenile court orders in Case Nos. 1-10-JD02022 [sic], 1-10-JD20223, and 1-10-JD20224.

At the contested section 388 hearing, Anthony Nkwo-Okere (Okere) testified that he was a supervising social worker with the Department of Family and Children's Services (Department). He had learned from Deputy District Attorney (DDA) Lisa Rogers that mother had violated a restraining order by having Facebook contact with her daughter L.M. He called L.M.'s father, who had custody of L.M. at that time. L.M.'s father confirmed that mother had Facebook contact with L.M.; L.M.'s father indicated he had supervised the interaction.

At that time, social worker Okere was unaware that mother was allowed some supervised contact with L.M. pursuant to court order. He examined the criminal protective order and found that it did not allow mother to have Facebook contact with L.M. He believed that mother had violated the criminal protective order when she had Facebook contact with L.M. and he gave that information to Sallie Danenberg. He acknowledged, however, that mother was not arrested for violating any criminal protective order and she was not alleged to have violated the terms of her criminal probation.

The addendum report dated April 24, 2013 indicated that, on October 31, 2011, mother was terminated from two programs, a 52-week child abusers' treatment program and a 52-week batterers' intervention program, for violating a no-contact order by having Facebook contact with her daughter, L.M. Mother had been ordered to participate in both those 52-week programs as part of her case plan.

5

Sallie Danenberg, the therapist facilitating the 52-week programs, explained in her program termination report for the child abusers' program, which was dated October 31, 2011 and attached to the April 2013 addendum report, that social worker Okere had notified her that mother was "in violation of a no contact order by having Facebook contact with her daughter [L.M.]" on October 31, 2011 and the program was "obligated to terminate her according to the standards of certification for [that] program." Mother had attended 52 sessions but she had not complied with all conditions of the program contract.

Danenberg also stated in that termination report that the level of child safety remained the same due to mother's limited level of engagement. Danenberg reported that mother had made only marginal progress in the following assessment areas: (1) "[d]emonstrates awareness of neglect and of using or permitting abusive behavior in the home," (2) "[a]ccepts responsibility and accountability for abusive behavior and/or neglect, including presenting offense(s)," and (3) "[d]emonstrates understanding of child's developmental needs and behaviors." The termination report reflected that mother had demonstrated somewhat greater progress in other areas.

Danenberg stated in her program termination report for the batterers' program, which was dated October 31, 2011 and attached to the April 2013 addendum report, that "[b]ased on a report from Tony Okere and fax from DDA Lisa Rogers, [mother] has violated a no contact order by having contact with her daughter [L.M.] on Facebook." The report indicated that mother had attended 50 sessions. It further indicated that mother had shown only marginal accountability in the following assessment areas: (1) "[d]emonstrates awareness of using abusive behavior past and present," (2) "[a]ccepts responsibility and accountability for abusive behavior, including present and past offense(s)," and (3) "[d]emonstrates awareness of the effects of violence on children and others." Mother had made adequate progress in some other areas. Mother had not made

6

statements indicating that she had "some understanding of the negative impact on children growing up in a chaotic and unpredictable environment."

Danenberg additionally indicated in that termination report that, if mother had been referred as a convicted perpetrator of domestic violence, she would not have been deemed eligible for successful completion of the batterers' program because she had not met the requisite criteria. Danenberg recommended that mother repeat the entire 52-week program if convicted. At the section 388 hearing, social worker Okere testified that mother had not completed the batterers' program in such a way as to satisfy the case plan requirements.

Social worker Okere's April 24, 2013 addendum report indicated that, on October 24, 2012, mother had obtained a small claims court judgment against Danenberg. That court apparently found there was "no violation of the terms of the protective order in effect on the date of Plaintiff's alleged violation"[8] and ordered Danenberg to deliver a certificate of completion for the child abusers' treatment program to mother once mother made "final payments and complete[d] remaining obligations pursuant to the contract with Defendant."[9] The addendum report disclosed that mother had subpoenaed social worker Okere to appear on October 23, 2012 but the case was not on calendar when he showed up on that date; he later discovered mother's case was actually heard on October 24, 2012 and the subpoena in the court's file had been altered to show that he was ordered to appear on October 24, 2012.

Danenberg testified that she was the clinical director and owner of New Beginnings, which was certified to provide certain programs, including the 52-week child abuse program (impliedly the child abusers' treatment program) and the 52-week

---

[8] We cannot ascertain from record before us the specific "date of Plaintiff's alleged violation" that was considered in that case.

[9] Danenberg provided only an certificate of attendance to mother.

7

domestic violence program (impliedly the batterers' intervention program). Danenberg supervised and directed its clinical staff and she also provided individual and group therapy. Mother had been enrolled in its child abuse program because she was charged with neglect and physical abuse of her children. Mother had also participated in the domestic violence program.

Danenberg learned from social worker Okere that mother had violated a restraining order by having Facebook contact with her daughter. Danenberg believed social worker Okere telephoned her and asked whether she was aware of the violation. On October 31, 2011, Danenberg received copies of the August 11, 2010 order and the September 16, 2011 order by fax from social worker Okere. At that time, the August 11, 2010 order had expired. The copy of the August 11, 2010 order also had the fax date of August 26, 2011 on it, which Danenberg believed was the date on which the DDA had faxed it to Okere.

On October 31, 2011, Danenberg terminated mother from both 52-week programs based on the reported violation of a court order. Danenberg stated that mother had attended 52 sessions of the child abuse program and, aside from the reported violation of a court order, she had satisfactorily completed the classes. On that date, mother still had two make-up sessions to attend to complete the domestic violence program.

Danenberg did not know when mother's violation of a court order had occurred. She could not investigate such violations and she relied on the referring social worker or probation officer to confirm whether a client had committed a violation. In class, mother had related her conversations with her daughter on Facebook.

Social worker Okere did not ask Danenberg to terminate mother from the programs. Mother's program contract states that she will obey all court orders. Violation of a protective order results in termination from the program.

8

Danenberg testified that mother had made marginal progress in three areas related to "taking responsibility." Those included mother's progress in demonstrating "awareness of using abusive behavior past and present." Danenberg stated that mother had made "very marginal" progress in demonstrating "awareness of the effects of violence on children and others." Danenberg believed that mother's criminal case "hampered her ability to fully benefit from the program."

At the hearing, mother's counsel argued that the change of circumstances was that it has "come to light the Mother has never violated any restraining order" and mother was asking for additional services.

The Department's counsel argued that the juvenile court order does not permit electronic communication but rather states that " 'visitation shall be supervised through letters and telephone contact.' " The Department's counsel contended that DDA Rogers made the determination that mother had violated a protective order and informed Okere of the violation. In addition, counsel maintained that mother "presented no evidence to show that what she wants is in the children's best interest."

Counsel for the children agreed that the criminal protective order clearly prohibited electronic communication and, while there was an exception for contact consistent with other specified orders, the juvenile court's order did not allow for electronic or Facebook communications. The children's counsel contended that, even if mother's Facebook contact occurred during a gap in the criminal protective orders,[10] the court could still consider whether mother was fully compliant with the juvenile court's order. The children's counsel further argued that the information regarding circumstances of mother's termination from the programs was available at the time of the 18-month review on April 16, 2012, when the court terminated mother's reunification services and

---

[10] The August 11, 2010 criminal protective order expired on August 11, 2011 and the next criminal protective order was not filed until August 31, 2011.

9

her visitation with the children. She maintained there had been no change of circumstances since the termination of mother's family reunification services and mother had made no showing that the requested orders would be in the children's best interest.

The juvenile court found there had been an inadequate showing of changed circumstances or new evidence, that is material evidence that, with the exercise of due diligence, could not have been presented when the orders sought to be modified were originally entered. It also found that mother had not shown that the children's best interest required modification of its prior orders. Mother had not visited the children for "close to two years" and the court was required to "look toward permanency and stability for these children."

The court denied mother's request for modification.

C. *Discussion*

Under section 388, "[a]ny parent . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court." (§ 338, subd. (a)(1).) A parent's petition must be verified and must "set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order . . . ." (*Ibid*.) "[T]he term 'new evidence' in section 388 means material evidence that, with due diligence, the party could not have presented at the dependency proceeding at which the order, sought to be modified or set aside, was entered." (*In re H.S.* (2010) 188 Cal.App.4th 103, 105.)

Section 338 provides: "If it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . , the court shall order that a hearing be held . . . ." (§ 388, subd. (d).) "Read literally, section 388 does not impose a 'best interests' standard on the merits of a modification request; it merely says that if it is apparent that the best interests of the child 'may be promoted' by the request, then the

10

juvenile dependency court 'shall' order a hearing. Nevertheless, case law, including several decisions of our Supreme Court, has consistently treated the statute as imposing a best interests standard on the proposed modification itself (as distinct from the hearing on the proposed modification). [Citations.]" (*In re Kimberly F.* (2010) 56 Cal.App.4th 519, 527, fn. 5.)

In assessing whether the best interests of a dependent child will be promoted by modification of an order, the court may consider the following factors among others: "(1) The seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Id*. at p. 532.) This is not an exhaustive list of considerations. (*Ibid*.)

"[T]he Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order. A petition pursuant to section 388 may be used to raise the issue in the trial court prior to the section 366.26 hearing." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Nevertheless, "[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) "The parent must show that the undoing of the prior order would be in the best interests of the child. (See *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 64 Cal.Rptr.2d 93 [fact that spousal abuse charges were dropped did not show even possibility that undoing reunification services was in the best interests of minor children].)" (*Ibid*.)

"After termination of services, the focus shifts from the parent's custodial interest to the child's need for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 . . . .) 'Whether a previously made order should be modified rests within the

11

dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.' (*In re Michael B., supra,* 8 Cal.App.4th at p. 1704.)  The denial of a section 388 motion rarely merits reversal as an abuse of discretion.  (*In re Kimberly F., supra,* 56 Cal.App.4th 519, 522.)" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)  " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citations]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Mother has failed to show that the juvenile court abused its discretion in ruling on her request for modification.  With due diligence, mother could have presented evidence regarding her progress with her case plan, including her record of program attendance prior to termination from the two 52-week programs on October 31, 2011 and evidence of all the circumstances surrounding those terminations at the 18-month review hearing on April 16, 2012.  (See *In re H.S., supra*, 188 Cal.App.4th at p. 105.)  Even though evidence of mother's small claims court judgment entered in October 2012 and evidence of mother's release from Elmwood Correctional Facility, reportedly on March 11, 2013, could not have been presented at the hearing on 18-month review hearing, mother presented no evidence showing that her requested changes would serve the children's best interests.

As mother acknowledges, at the 18-month review hearing on April 16, 2012, the court found that visitation between mother and the children would be detrimental to their emotional well-being and terminated visitation.  The best interests standard was not met by the mere disclosure in the section 366.26 report (dated August 8, 2012) that, in June 2012, A.H. refused to participate in therapy with her foster parents with whom she was having serious difficulties but requested therapy with her mother with whom she had

12

Facebook contact. She made no showing that the requested twice-a-week visitation with each child would promote the children's best interests. (See *In re S.J.* (2008) 167 Cal.App.4th 953, 959.) Mother also failed to show that the immediate return of the children to her custody and control under a plan of family maintenance or further reunification services for her would promote their best interests.

Mother did not carry her evidentiary burden. In denying her request for modification of prior orders, the juvenile court acted well within the bounds of reason.

*Case No. H040026*

*Appeals from August 14, 2013 Orders Pursuant to Section 366.26*

A. *Procedural and Factual Background*

Long before the section 366.26 hearing held in August 2013, the Department explored the possibility of placing the children with a maternal aunt and her family who resided in Colorado. In an addendum report, dated November 11, 2012, the Department recommended placement with maternal relatives in Colorado as the permanent plan for both of the children.

A Colorado "ICPC Coordinator" denied placement of A.H. and S.H. with their Colorado relatives in November 2012.[11] The ICPC Coordinator did not absolutely rule out such placement in the future, however, and the coordinator indicated that further consideration of such relative placement would require additional information, including

---

[11]    California has adopted the Interstate Compact on Placement of Children [ICPC] and enacted implementing legislation. (Fam. Code, § 7900 et seq.) "The ICPC is a compact among California and other states, the purpose of which is ' "to facilitate the cooperation between states in the placement and monitoring of dependent children." [Citation.]' (*In re John M.* (2006) 141 Cal.App.4th 1564, 1573 . . . .) Pursuant to the ICPC, no child shall be 'sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state [ ] notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.' (Fam. Code, § 7901, art. (3), subd. (d).)" (*In re Suhey G.* (2013) 221 Cal.App.4th 732, 742.)

"updated assessments and treatment summaries regarding [A.H.'s] current behaviors, mental health diagnoses, and ongoing treatment recommendations," and recommended that Santa Clara County "initiate some form of communication to foster a relationship between [A.H.] and the [relatives], and with [L.M.]," who had been placed with those relatives.

The Department's addendum report, dated December 20, 2012, recommended looking for an alternative placement for A.H. in light of the denial of relative placement in Colorado.

The Department's subsequent addendum reports (dated January 14, 2013, March 13, 2013, and April 24, 2013) recommended different permanent plans for A.H. and S.H. For A.H., it recommended a planned permanent living arrangement in a confidential foster home. For S.H., it recommended adoption.

B. *Contested Section 366.26 Hearing*

On August 14, 2013, the juvenile court held the contested 366.26 hearing. The court admitted the section 366.26 report and addendum reports.

At the section 366.26 hearing, social worker Okere testified as an expert in risk assessment and the placement needs of, and permanency planning for, dependent children. He had been the supervising social worker in the children's dependency cases since January 10, 2011. At the time of the hearing, the children were placed together in the same foster home. S.H. had been placed there since July 2010. A.H. had also been placed there in July 2010 but there were periods when she was not in the foster home because of behavioral issues.

Okere indicated that A.H. was currently receiving wrap-around services with the goals of maintaining the foster home placement and her safety and supporting her. A.H. was working on her social skills and anger management with the wrap team.

14

Okere confirmed that the wrap team would continue working with A.H. and her foster family after the court selected a permanent plan for her. The recommended permanent plan for A.H. was "a planned permanent living arrangement in a confidential foster home," expected to be the same foster home in which her brother and she were currently placed. The foster parents were committed to providing A.H. with a long-term, stable, and permanent home. A.H., who at the time of the hearing was 13 years old, had expressed her wish not to be adopted. At that time, there was no adult available to serve as her legal guardian.

Okere reported that S.H., who was nine years old at the time of the hearing, had expressed his desire to remain in his current foster home and be adopted by his current foster parents. Even when there had been a possibility that A.H. would move out of state to live with relatives in Colorado, he had wanted to remain in the foster home and be adopted. Even though he would have no legal relationship with his parents if adopted, S.H. wanted to be adopted. S.H. had developed a healthy attachment to his foster parents. S.H. considered his foster parents to be his parents. He looked primarily to them for support.

Okere stated that S.H. was adoptable. Another adoptive home would be found for him if, for some reason, he could not be adopted by his current foster parents. In Okere's opinion, adoption was the most appropriate permanent plan for S.H.

It was also Okere's opinion that the children had a healthy positive attachment to each other. The foster parents were committed to having both children remain in their home. The foster parents had taken S.H. to visit A.H. when A.H. was not living in their home. They have "always wished to raise both kids together" and they wanted the children to maintain a relationship.

Mother testified that she disagreed with the permanent plan recommendation of adoption and termination of parental rights as to S.H. She also testified regarding the

family before removal of the children, her visits with the children, and the children's interactions and relationship with each other.

In rebuttal, Okere indicated that each child decided, at some point, that he or she did not want to visit with mother. S.H. told his therapist that he did not wish to visit mother and the therapist indicated that "[i]t would not be healthy for the Department to continue to push him to return to the visits."

Following the contested section 366.26 hearing, the juvenile court found by clear and convincing evidence that it was likely that S.H. would be adopted. As to S.H., the court selected adoption as his permanent plan and terminated mother's and father's parental rights as to him. The juvenile court continued S.H. as a dependent child of the court and ordered him to continue under the Department's care, custody and control for foster home placement. The court referred S.H. to the county adoption agency for adoptive placement.

As to A.H., the juvenile court selected long-term foster home placement as her permanent plan with a specific goal of independent living with "identification of a caring adult to serve as a lifelong connection for the youth." Parental rights as to A.H. were not terminated. The court ordered the parents to have "no physical contact or communication of any kind" with A.H. "because it is detrimental to the physical and/or emotional well-being of the child."

C. *Discussion*

1. *Mother's Appeal*

Mother now claims that the juvenile court failed to properly consider relative placement for both children under section 361.3. She asserts that the children's maternal aunt, who resides in Colorado, was entitled to preferential placement consideration. Neither child was residing with the aunt at the time of the section 366.26 hearing.

16

Section 361.3 sets forth the relative placement preference for a child who has been removed from parental custody. The section gives a relative "preferential consideration," which "means that *the relative seeking placement* shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1), italics added.) Section 361.3, subdivision (a), specifically provides in part: "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to *a request by a relative* of the child for placement of the child with the relative, regardless of the relative's immigration status." (Italics added.)

After child has been removed from parental custody, "whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements." (§ 361.3, subd. (d); see *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034 [grandmother requested placement; relative placement preference applies to new placements made after termination of reunification services but before termination of parental rights and referral for adoptive placement].) Thus, the relative placement preference "applies at the dispositional hearing and thereafter 'whenever a new placement of the child must be made . . . .' (§ 361.3, subd. (d).)" (*In re Lauren R.* (2007) 148 Cal.App.4th 841, 854.) In determining whether a new out-of-home placement with a relative is appropriate, the county social worker and court must consider certain specified factors, including "whether the relative has established and maintained a relationship with the child." (See § 361.3, subds. (a) & (d).)

Mother contends that it does not appear from the record that the Department "complied with the recommendations of the ICPC coordinator to initiate contact between the children and their relatives in an effort to transition them to Colorado." She complains that, prior to the section 366.26 hearing, the Department failed to comply with

17

"the recommendations of the ICPC coordinator to initiate contact between the children and their relatives in an effort to transition them to Colorado." She charges the court with neglecting to "consider relatives who were still in the approval process and should have been given preference for placement" as to both children. She argues that "[t]he juvenile court failed to properly consider the relatives, who had a right to be preferred over other placement options for A.H." She asserts that "[t]he court had a duty to order the Department to follow up on the recommendations of the ICPC coordinator."

In dependency proceedings, "[t]he dispositional order is the 'judgment' referred to in section 395, and all subsequent orders are appealable. [Citation.]" (*In re S.B.* (2009) 46 Cal.4th 529, 532.) " ' "A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." [Citation.]' [Citations.]" (*Ibid*.)

Insofar as mother is arguing that, during the course of the dependency proceedings prior to the section 366.26 hearing, the Department or the juvenile court failed to properly pursue a relative placement with the Colorado relatives, those grievances are not cognizable on appeal from the juvenile court's section 366.26 orders.[12] Our review is limited to the orders made on August 14, 2013 under section 366.26.

Although not raised by the Department, mother does not appear to have standing to raise her claims with regard to S.H. since she is not challenging its finding that S.H. is likely to be adopted. (See *In re K.C.*, *supra*, 52 Cal.4th at pp. 236-237; § 366.26,

---

[12]    If a new placement must be made for a dependent child and the social worker or the court does not comply with section 361.3, a parent may need to seek writ relief. (See Code Civ. Proc., §§ 1085 [a writ of mandate may be issued by any court to "compel the performance of an act which the law specially enjoins"], 1086 ["writ must be issued in all cases where there is not a plain, speedy, and adequate remedy"]; *Cesar V. v. Superior Court*, *supra*, 91 Cal.App.4th at p. 1036 [writ relief compelling juvenile court to enter order directing social services agency to complete its relative assessment as required by section 361.3].)

18

subd. (c) ["If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. . . ."].) Since mother's parental rights were not terminated as to A.H., however, we address her appellate claims insofar as they are cognizable.

Under section 366.26, the juvenile court must, after holding the requisite evidentiary hearing, "make findings and orders *in the following order of preference*: [¶] (1) Terminate the rights of the parent or parents and order that the child be placed for adoption and, upon the filing of a petition for adoption in the juvenile court, order that a hearing be set. . . . [¶] (2) Order, without termination of parental rights, the plan of tribal customary adoption . . . . [¶] (3) Appoint a relative or relatives with whom the child is currently residing as legal guardian or guardians for the child, and order that letters of guardianship issue. [¶] (4) On making a finding under paragraph (3) of subdivision (c), identify adoption or tribal customary adoption as the permanent placement goal and order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days. [¶] (5) Appoint a nonrelative legal guardian for the child and order that letters of guardianship issue. [¶] (6) Order that the child be placed in long-term foster care, subject to the periodic review of the juvenile court under Section 366.3." (§ 366.26, subd. (b), italics added.)

Thus, the "general statutory preference is to terminate parental rights and place the child for adoption. (§ 366.26, subd. (b)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 53 . . . .)" (*In re G.C., Jr.* (2013) 216 Cal.App.4th 1391, 1397-1398.) "If adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child. (§ 366.26(c)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 53 . . . .)" (*In re S.B.*, *supra*, 46 Cal.4th at p. 532.) "The fact that the child is not yet placed in a preadoptive home nor with a relative or

foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (§ 366.26, subd. (c)(1).)

"The section 366.26 hearing is a critical late stage in a dependency proceeding. The child has been under juvenile court jurisdiction for an extended period following the dispositional order, and the court has held one or more review hearings to consider a return to parental custody. (See § 366.21.) At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 . . . .) Section 366.26 sets out 'the exclusive procedures for conducting these hearings.' (§ 366.26, subd. (a).)" (*In re S.B.*, *supra*, 46 Cal.4th at p. 532.) "Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) "[T]he sole purpose of the section 366.26 hearing is to select and implement one of the listed permanent plans." (*Id.* at p. 304.)

Moreover, once the court approves a permanent plan for adoption, a different preference applies concerning adoptive placement: "Notwithstanding any other provision of law, the application of any person who, as a relative caretaker or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption . . . shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional well-being." (§ 366.26, subd. (k).) For purposes of this provision, " 'preference' means that the application shall be processed and, if satisfactory, the family study shall be completed before the processing of the application of any other person for the adoptive placement of the child." (*Ibid.*)

As required, the juvenile court selected permanent plans for the children pursuant to section 366.26 and in accordance with the order of preference established by that section. Section 361.3 was inapplicable because the court was not ordering new placements for the children and there was no relative request for placement pending before the court. Moreover, review of post-termination placement orders must be obtained by special writ and, therefore, any challenge to the court's post-termination placement order regarding S.H. is not cognizable in this appeal.[13]

Mother has not shown that the court abused its discretion in selecting the children's permanent plans following the section 366.26 hearing. The court's August 14, 2013 orders may not be reversed on any of the grounds advanced by mother.

2. *Father's Appeal*

Father similarly contends that the juvenile court erred by failing to properly apply section 361.3 with regard to A.H. He claims that, in assessing whether placing A.H. with maternal relatives in Colorado was appropriate, the court failed to consider the factors set forth in section 361.3, failed to exercise its independent judgment under section 361.3, and failed to fully document its reasons for denying such placement as required by section 361.3, subdivision (e).

Insofar as father's claim is that, during the course of the dependency proceedings prior to the section 366.26 hearing, the Department or the juvenile court failed to properly pursue a potential relative placement with the Colorado relatives, those grievances are not

---

[13] Following termination of parental rights, review of post-termination judicial orders that "a dependent child is to reside in, be retained in, or be removed from a specific placement" must be obtained by complying with special writ procedures. (§ 366.28, subd. (b)(1); see Cal. Rules of Court, rules 8.454, 8.456, 8.490.) Other orders made following a section 366.26 hearing may be raised on appeal. (§ 366.28, subd. (c) ["This section does not affect the right of a parent, a legal guardian, or the child to appeal any order that is otherwise appealable and that is issued at a hearing held pursuant to Section 366.26"]; see Cal. Rules of Court, rule 8.456(i).)

cognizable on appeal from the juvenile court's section 366.26 orders.  (See *In re S.B.* (2009) 46 Cal.4th 529, 532 and fn. 12, *ante*.)  As we have fully explained in regard to mother's appeal, the juvenile court was authorized to select among only the statutorily prescribed permanent plans (§ 366.26, subd. (b)) and section 361.3 did not apply.

Given our conclusions, it is unnecessary to address the parents' remaining contentions predicated on our reversal of an order.

DISPOSITIONS

In Case No. H039967, the juvenile court's June 26, 2013 order denying mother's request for modification is affirmed.

In Case No. H040026, the juvenile court's August 14, 2013 orders are affirmed.


_____

ELIA, J.


WE CONCUR:


_____

PREMO, Acting P. J.


_____

MIHARA, J.